UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RODERICK DENNIS GIBSON,

    Petitioner,

v.

RANDALL HAAS,

    Respondent.
_____/

Case No. 16-cv-13549
Hon. Matthew F. Leitman

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS (ECF #1), (2) DENYING A CERTIFICATE OF APPEALABILITY, AND (3) GRANTING PERMISSION TO APPEAL IN FORMA PAUPERIS**

Roderick Dennis Gibson ("Gibson") is a state prisoner in the custody of the Michigan Department of Corrections. On October 3, 2016, Gibson filed a petition for a writ of habeas corpus in this Court pursuant 28 U.S.C. § 2254. (*See* ECF #1.) In that petition, Gibson challenges his state-court convictions of three counts of first-degree murder, MICH. COMP. LAWS § 750.316, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. Following a jury trial, the state court sentenced Gibson to three concurrent terms of life imprisonment for the murder convictions and a consecutive two-year term for the firearm conviction.

Gibson raises four claims in his petition: (1) the trial court erred when it failed to declare a mistrial after a police officer testified that he interviewed a previously undisclosed eyewitness; (2) the prosecution violated a discovery order when it failed to provide police activity logs to defense counsel; (3) the prosecution committed misconduct when it vouched for the credibility of the prosecution's star eyewitness; and (4) Gibson's trial counsel was ineffective when he failed to object to the misconduct of the prosecution. (*See id.*)

The Court has reviewed Gibson's petition and concludes that his claims are without merit. Therefore, the Court **DENIES** the petition. The Court will also deny Gibson a certificate of appealability. However, it will grant him permission to appeal *in forma pauperis*.

# I

## A

The charges against Gibson arose from allegations that he and two other men shot to death three men who were sitting in a parked car on a residential street in Detroit. Duane Thomas, Jermar Gibson ("Jemar"), and Omar Johnson ("Omar") were also charged with various offenses arising out of this incident.

The prosecutor's star witness was Cleophus Pye. Pye testified that he and the co-defendants were life-long friends, and he considered them to be members of his family.

According to Pye, during the afternoon of June 4, 2011, Gibson arrived at Pye's house and asked Pye to move his car from the street, telling Pye, "It's about to go down." (ECF #9-11 at Pg. ID 820.) About an hour later, as Pye was standing outside with Gibson, Thomas, Jermar, and two other neighbors, Pye overheard Jermar talking on his cell phone. Jermar told the person he was speaking with, "I'm on the block," and then Jermar told Thomas that "they on they way." (*Id.* at Pg. ID 826-28.) Jermar then walked into the middle of the street and signaled to a car that was driving towards them. (*See id*. at Pg. ID 832.) Jermar told Thomas, "that's him, he pulling up." (*Id.* at Pg. ID 833.)

The car stopped behind Pye's vehicle. Pye walked towards it and saw that three men were seated inside. The front seat passenger had a handgun between his legs. Pye heard gunshots and turned to see Gibson firing an AK-47 into the air. Meanwhile, Thomas moved to the driver's side window, pulled out a revolver, and shot the driver in the back of the head. Gibson approached the front passenger window and fired the AK-47 into the car. Pye heard Thomas yell at Gibson, "you shot me," and Thomas stumbled away from the vehicle. (*Id.* at Pg. ID 850.) Gibson continued to shoot into the passenger window.

Omar, who is Gibson's uncle, approached Gibson and took the AK-47 from him. Gibson then climbed into the driver's seat of the car, pushed the body of the driver over, and drove the car away. Omar returned a few minutes later with a broom

3

and swept broken glass from the street and picked up shell casings. Pye noticed that Thomas was lying in the street, and so he called 9-1-1.

When Detroit Police Officers responded to the scene, they found Thomas lying on the ground with a gunshot wound. About a block away, officers found a car containing the bodies of the three victims, later identified as Curtis Burnett, Gary Owens, and Shemar Johnson. Officers recovered broken automobile glass and spent shell casings in the street near Omar's residence. Blood droplets and a piece of human flesh were found in the street and on the sidewalk. Inside Omar's residence, officers recovered unspent 7.62mm rounds, similar to some of the spent casings found in the street.

A few days after the shooting, Pye met with Detroit Police Officer Derrick Mayes and gave a statement implicating Gibson, Thomas, and Jermar. Omar later informed Pye that Jermar had owed money to one of the victims, and that Gibson had initially fired shots into the air to warn him to get away from the vehicle. Pye testified that Gibson called him several times after the shooting and offered to pay him $5,000 to tell the police that Gibson was not present at the scene. Pye thereafter move

Evidence gathered at the scene corroborated some of Pye's eyewitness account. Forensic examiners were able to match a few of the casings found at the scene with slugs found in the vehicle, and the various calibers of the casings

4

indicated more than one weapon was used. Broken automobile glass found at the location where Pye said that the shooting occurred matched the victims' vehicle, and some of the blood found in the street was matched to co-defendant Thomas. In addition, cell phone records indicated that shortly before the shooting, and during the time-frame testified to by Pye, phone calls were made between Jermar and victim Gary Owens. Finally, the prosecution presented evidence that based on the location of the cell towers used for those calls, Jermar was in the general vicinity of the incident at the time of the shooting.

Two Detroit Police Officers also testified at trial. Officer Johnell White testified that during the early part of the investigation, after he received information regarding a possible eyewitness, he proceeded to a nearby grocery store. White then testified as follows:

> Q: All right. And do you recall the reason why you went to that grocery store?
>
> A: We went there to meet a possible witness to the shooting.
>
> Q: Alright. And did you in fact meet someone when you went to that grocery store?
>
> A: Yes, we did.

(ECF #9-15 at Pg. ID 1455.) Before White testified any further, defense counsel asked for a sidebar and proceedings were concluded for the day.

5

The following morning, defense attorneys for the all the defendants moved (1) to exclude any testimony about what the eyewitness might have told Officer White and (2) for a mistrial. The trial court ruled that Officer White could not testify as to any statements made by the witness on hearsay grounds, but it denied the motion for mistrial:

> This is the Court's ruling. I'm ready to rule. I find that based - First of all, just to make it very clear, no evidence will be admitted from Officer Johnell White as it relates to the identity, the substance of the discussion he had with the anonymous person, period. I don't want any reference at all to Officer White's meeting with an anonymous person. And I do that for two reasons; number one, I really do feel that there was a duty on [the prosecutor's] part in light of the fact that there was a written statement from this officer, and because of the fact, Ms. Stanford, that you received information yesterday, that you could - you should have, I believe, supplemented that information that you received at noon to the defense counsel. And I think with all that has been said - this is not a remedy, necessarily, in response to what I consider to have been an obligation that you had to disclose it, I'm just simply determining at this point, now, that it is really not relevant, you do not need to have that information admitted for purposes of getting from this officer a basis as to why he went to the back of 9660.
>
> ***
>
> I want to make the record very clear, I do not agree with that, there are no grounds here for a mistrial, there is nothing that I believe that was placed before this jury yesterday, through the testimony of Officer White, that would prejudice anybody that has been charged had this case. I don't believe it, I'm ruling that is not a concern for

> this Court, and as a result [defense counsel's] requests for a mistrial is denied.

(ECF #9-16 at Pg. ID 1485-86.)

Officer Mays, the officer in charge of the case, also testified. Mays testified that although police officers canvassed the neighborhood two days after the shooting, and that police activity logs were generated as a result, the logs were not turned over to the defense. (*See* ECF #9-18 at Pg. ID 1839.) The trial court then ordered the prosecutor to turn-over the logs. (*See id.* at Pg. ID 1841-42.) The logs indicated that police officers handed out flyers regarding the shooting, but no witnesses came forward. (*See* ECF #9-19 at Pg. ID 1864-69.)

During closing arguments, the prosecution made comments regarding Pye's credibility that are relevant to Gibson's petition:

> We get some sense of hope that vicious crimes like this will not continue to go forward without people coming forward and we get that sense of hope because Cleophus Pye could not be silenced, could not be bought by these defendants, and could not be deterred from telling what he witnessed, from telling the truth. And Mr. Pye told the truth about the actions of four individuals, four people that he's known his entire life, four people that he considered to be family members to him, four people that he witnessed commit these heinous crimes. Mr. Pye's actions as it relates to this case were courageous, honorable, and heroic. And if you think about it, ladies and gentlemen, he sat before you all for at least three days, he sat before you being questioned vigorously about his credibility, about his motives, about his intent, and he sat before four men that he's known all his life and he told you all what he saw them do. He sat before a neighborhood, and he explained,

7

and he stood there, and he told you what he saw happened on June 4th, and he did it because he believed it was the right thing to do. Imagine how difficult it had to be. And it wasn't the first time he was vigorously questioned by many attorneys. He consistently told the truth about what he witnessed and what he watched on June 4th of 2011. He left his home with his family never to return there again and he did this because he knew that he had to.

(ECF #9-20 at Pg. ID 2099-100.)

Following closing arguments, jury instructions, and deliberations, the jury convicted all of the Defendants, including Gibson, as charged. Gibson thereafter filed a claim of appeal in the Michigan Court of Appeals that raised four claims:

> I. Whether the prosecutor's misconduct in failing to disclose evidence of an eyewitness to the shooting and eliciting from a police officer inadmissible and highly prejudicial testimony that he met with the alleged eyewitness denied appellant a fair trial and violated appellant's right to confrontation and the trial court abused its discretion in denying counsel's request for a mistrial based thereon.
>
> II. Was appellant deprived of his constitutional rights to the effective assistance of counsel, to due process of law, to effectively confront and cross examine witnesses and to present a defense by the prosecutor's failure to timely provide critical discovery and the trial court's failure to grant a meaningful remedy as a result of the misconduct?
>
> III. The prosecutor vouching for the credibility of the state's lone eyewitnesses deprived appellant of a fair trial in violation of the Michigan Constitution and the Due Process Clause of the Fourteenth Amendment.
>
> IV. Was appellant denied effective assistance of counsel guaranteed to him by the Sixth Amendment and Michigan

>Constitution, where defense counsel failed to object to the prosecutorial misconduct?

(ECF #9-24 at Pg. ID 2309.)

The Michigan Court of Appeals affirmed Gibson's conviction in an unpublished opinion. *See People v. Gibson*, 2015 WL 447197 (Mich. Ct. App.

Gibson then filed an application for leave to appeal in the Michigan Supreme Court raising the same four claims that he raised in the Michigan Court of Appeals. (*See* ECF #9-25.) The Michigan Supreme Court denied Gibson's application in a standard form order. *See People v. Gibson*, 498 N.W.2d 884 (Mich. 2015) (Table).

## II

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires federal courts to uphold state court adjudications on the merits unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

# III

## A

Gibson first asserts that the state trial court erred when it failed to grant a mistrial after Officer White testified that he met an unnamed witness to the shooting at a grocery store. Gibson insists that this testimony amounted to the admission of hearsay in violation of his rights under the Confrontation Clause because it suggested that an unknown person witnessed the shooting.

The Michigan Court of Appeals considered this claim on direct appeal and rejected it on the ground that the brief statement by Officer White regarding meeting an eyewitness did not unfairly prejudice Gibson:

> The jury heard only that Officer White had left the crime scene to go to another location to meet with an apparent witness to the shooting. No evidence was offered indicating what this anonymous person may have heard or seen, or how the officer's encounter with the witness impacted the case. Contrary to what Roderick argues, there is no indication that any statements by this anonymous person were admitted at trial. Indeed, the trial court agreed that any statements by the person would be inadmissible hearsay and thus could not be admitted. And because the anonymous person did not testify and no statement from the anonymous person was admitted, there was no violation of Roderick's right of confrontation. The trial court also prohibited further inquiry regarding the anonymous person for the purpose of explaining Officer White's actions after meeting with the anonymous person. Under the circumstances, there is no basis for concluding that the mere reference to the anonymous person was prejudicial to Roderick. Accordingly, the trial court did

>not abuse its discretion in denying Roderick's motion for a mistrial.

*Gibson*, 2015 WL 447197, at *2.

This decision was not unreasonable. The Michigan Court of Appeals could reasonably have concluded that Gibson's rights under the Confrontation Clause were not violated because the trial court did not admit a non-testifying witness's testimonial statement offered for the truth of the matter asserted. *See, e.g.*, *United States v. Deitz*, 577 F.3d 672, 683-84 (6th Cir. 2009) (out-of-court statements providing background information as to why the police took the actions they did are not offered to establish the truth of the matter asserted). At most, Officer White's testimony suggested that an unidentified eyewitness aided the investigation. The substance of the information was not relayed to the jury nor was it suggested by either the prosecutor or Officer White. Simply put, no statement or implied statement by a non-testifying declarant was offered for the truth of the matter asserted.

Gibson further maintains that the prosecutor committed misconduct when he elicited this testimony and failed to produce evidence related to the testimony to the defense. Gibson raised this issue in his direct appeal (*see* ECF #9-24 at Pg. ID 43-47), but it does not appear that the Michigan Court of Appeals directly addressed it. The Court will therefore review the claim *do novo*. The Court concludes that Gibson is not entitled to relief on this claim because there is no indication that information favorable to the defense was suppressed. *See, e.g.*, *Carter v. Bell*, 218 F.3d 581, 601

11

(6th Cir. 2000) (to establish relief for prosecutor's failure to disclose evidence, habeas petitioner must demonstrate, *inter alia*, that the suppressed evidence was favorable or exculpatory)[1]; *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (same). In addition, Gibson is not entitled to relief because the trial court prevented the prosecutor from eliciting the substance of the statement and, in addition, from eliciting testimony as to whether (and how) the witness's statement aided in the investigation – thereby minimizing the potential for prejudice to Gibson's defense. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (to be entitled to habeas relief on a prosecutorial misconduct claim, petitioner must show that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process") (internal quotation marks omitted).

**B**

Gibson next argues that the prosecution failed to turn-over police activity logs prior to trial, and that the trial court's remedy of ordering the production of those logs during trial was an insufficient remedy for the discovery violation.

---

[1] The petitioner in *Carter* filed his habeas petition prior to the enactment of AEDPA. Therefore, AEDPA did not apply to the court's review of the petition. *See Carter*, 218 F.3d at 591 (noting that the court was "permitted greater latitude in examining the proceedings than is permissible under AEDPA governed cases").

The Michigan Court of Appeals considered this claim on direct appeal and rejected it on the ground that the prosecution's violation of court's discovery order did not prejudice Gibson's defense:

> In this case, the trial court permitted the defendants to inspect Officer Maye's activity logs, material that had not previously been produced, before Officer May resumed testifying. Because no canvass sheets were ever compiled, there were no canvassing records to produce during discovery. It is unclear whether the activity logs were required to be produced. Assuming that they were, we conclude that the trial court's remedy of furnishing that information to defense counsel before Office[r] Maye resumed testifying was adequate to address the situation and, therefore, the trial court did not abuse its discretion.
>
> The testimony at trial indicated that the additional canvassing of the neighborhood did not lead to any new evidence, either exculpatory or inculpatory, and Roderick does not explain how the late disclosure of the activity log information prejudiced his case. To the extent Roderick argues that the trial court should have granted a continuance to provide him with more time to review the records, he does not explain why more time was necessary, and he did not request any additional time when the records were turned over. A trial court does not abuse its discretion by failing to grant a continuance in the absence of a request.

*Gibson*, 2015 WL 447197, at *4.

This decision was not unreasonable. Gibson has not offered any argument as to how additional time to review the police activity logs would have provided any benefit to his defense. Based on the record before the Court, it appears that the logs

13

merely indicated that the police passed flyers regarding the shooting around the neighborhood, but no witnesses came forward as a result of the canvass.

Gibson does assert that "[i]t is impossible to know, after the fact, what effect upon the trial the timely furnishing of the [police logs] would have had." (ECF #1 at Pg. ID 23.) But such an argument is insufficient to establish entitlement to habeas relief. Gibson bears the burden of showing that the loss of the opportunity to conduct an investigation based on any information contained in the police logs resulted in the loss of exculpatory evidence and that the prosecution acted in bad faith. *See Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). He has established neither factor. Indeed, it is unclear how Gibson could have lost any exculpatory evidence when the canvass apparently generated no leads at all. Gibson is therefore not entitled to habeas relief on this claim.

## C

Gibson next maintains that the prosecution committed misconduct during closing argument when it vouched for the credibility of Pye, its primary eye-witness. Gibson further asserts that his trial attorney provided ineffective assistance of counsel for failing to object this alleged misconduct.

The Michigan Court of Appeals considered Gibson's prosecutorial misconduct claim on direct appeal and rejected it:

> Viewed in context, the prosecutor's comments did not refer to any personal beliefs or special knowledge about

14

> Pye's credibility. Rather, the prosecutor argued that Pye was a credible witness for reasons grounded in the evidence. At trial, Pye explained that he delayed in coming forward because he feared for his life and for his family's safety. He also testified that he had known the defendants all of his life and considered them to be family. It was not inappropriate for the prosecutor to emphasize these circumstances in arguing that Pye's testimony was credible. Accordingly, the prosecutor's remarks were not improper and there was no error, plain or otherwise.

*Gibson*, 2015 WL 447197, at *5.

This conclusion was not unreasonable. Improper vouching, as a form of prosecutorial misconduct, "occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the [prosecutor] behind that witness." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999). "Generally, improper vouching involves either blunt comments [relating to a witness's credibility], or comments that imply that the prosecutor had special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *Id*. (citations omitted).

Here, it was not unreasonable for the Michigan Court of Appeals to conclude that the prosecutor's comments regarding Pye's credibility did not constitute improper vouching. The comments were based on the evidence presented at trial and did not involve blunt comments or imply hidden knowledge. The prosecutor asserted that Pye should be believed because the four people he implicated were close personal friends who he knew his whole life and considered as member of his

15

extended family. This comment was based on Pye's testimony describing his relationship with the defendants. The prosecutor described Pye's testimony as courageous, honorable and heroic – not unreasonable characterizations of the testimony of a person who was willing to set aside close friendships to testify in a triple-murder case. It also fairly described the actions of man who moved himself and his family to a hotel for safety and testified over the course of several days before a gallery containing neighbors, family, and friends of the co-defendants who might view him as a "snitch."

Finally, because Gibson has not established that the prosecutor's comments were improper, he has failed to show how his counsel's failure to object to those comments constitutes ineffective assistance of counsel. *See Finkes v. Timmerman-Cooper*, 159 Fed. App'x 604, 611 (6th Cir. 2005) (rejecting ineffective assistance claim and holding that "[b]ecause the [state] courts have held that the prosecution did not engage in improper questioning, argument or conduct under state law, and we find no such deficiency under the Sixth Amendment, defense counsel's failure to object to the prosecutor's actions does not constitute unprofessional conduct under the *Strickland* test").

# IV

In order to appeal the Court's decision, Gibson must obtain a certificate of appealability. To obtain a certificate of appealability, a prisoner must make a

substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *See Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *See Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002).

Here, jurists of reason would not debate the Court's conclusion that Gibson has failed to demonstrate entitlement to habeas relief with respect to any of his claims because they are all devoid of merit. Therefore a certificate of appealability will be denied.

Although this Court declines to issue Gibson a certificate of appealability, the standard for granting an application for leave to proceed *in forma pauperis* on appeal is not as strict as the standard for certificates of appealability. *See Foster v. Ludwick*, 208 F.Supp.2d 750, 764 (E.D. Mich. 2002). While a certificate of appealability may only be granted if a petitioner makes a substantial showing of the denial of a constitutional right, a court may grant *in forma pauperis* status if it finds that an appeal is being taken in good faith. *See id.* at 764-65; 28 U.S.C. § 1915(a)(3); Fed. R.App.24 (a). Although jurists of reason would not debate this Court's resolution of

Gibson's claims, an appeal could be taken in good faith. Therefore, Gibson may proceed *in forma pauperis* on appeal.

## V

Accordingly, for the reasons stated above, the Court 1) **DENIES WITH PREJUDICE** Gibson's petition for a writ of habeas corpus (ECF #1), 2) **DENIES** Gibson a certificate of appealability, and 3) **GRANTS** Gibson permission to appeal *in forma pauperis*.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: April 18, 2018

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 18, 2018, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9763